**OPINION OF THE JUSTICES of the Supreme Judicial Court given under the Provisions of Section 3 of Article VI of the Constitution.**

Supreme Judicial Court of Maine.

Questions Propounded by the House in an Order Dated March 2, 1977.

Answered March 10, 1977.

## HOUSE ORDER PROPOUNDING QUESTIONS

### State of Maine

Whereas, in connection with the proposed examination by the House of ballots cast in the general election of November 2, 1976, for a House seat in District 45, certain questions have arisen with regard to the validity of the absentee ballots cast in said election; and

Whereas, that election involved 3 candidates, David Ault, Jed Davis and Charles Rollins; and

Whereas, the present dispute is based on a challenge petition filed with the House by Mr. Davis and involves only Mr. Ault and Mr. Davis; and

Whereas, Mr. Ault has been seated conditionally by the House pending determination of the present dispute; and

Whereas, with absentee ballots counted, a difference of 30 votes separates the contestants, the contestants having stipulated 1,811 votes for Mr. Ault and 1,781 votes for Mr. Davis; and

Whereas, the Commission on Governmental Ethics and Election Practices has examined the matter, a copy of its findings of fact and opinion being attached hereto as Appendix A; and

Whereas, the Commission on Governmental Ethics and Election Practices made certain findings of fact which are quoted herein and adopted by the House for the purposes of this order, as follows:

"All 263 absentee ballots were subject to challenge . . ."

"The ground for dispute of the absentee ballots as specified in papers filed on behalf of Jed Davis were as follows:

A. Fifty-three absentee ballots were challenged on the grounds that the name and address of the voter were not written or typed in the upper lefthand corner of the return envelope by the town clerk.

B. Three were challenged because the envelope was not signed by the voter.

C. Four were challenged because the voter's signature on the envelope was not certified.

D. Nine were challenged because no reasons for voting absentee were specified on the envelope.

E. One was challenged because no address appeared on the envelope.

F. Two were challenged because the absentee ballot applications were not signed by the voter.

G. Seventeen were challenged because the registrar of voters did not certify the applicant to be a registered voter.

H. Seventy-eight were challenged because the voters did not designate a recipient for the absentee ballot on the application."

"No question of fraud was pressed regarding the absentee ballots, although investigation was urged in some documents submitted on behalf of Mr. Davis. It could not be determined exactly how many absentee ballots might be defective, since more than one alleged defect might

have applied to the same ballot. Further, it was conceded that none of the absentee ballots were challenged at the polling place at the time the absentee ballot envelopes were opened and deposited in the ballot box, nor was a challenge made at any other time when it would have been possible to tie specific ballots to the envelopes and applications containing the alleged defects. Accordingly, Mr. Davis contested the validity of all absentee ballots. The challenge regarding the absentee ballots was thus raised for the first time at the recount and reiterated in the appeal hearing before the commission;" and

Whereas, since this court last examined questions relating to absentee ballot procedures, the Legislature has enacted Title 21, section 2, which provides rules of construction for interpretation of the words "shall," "must" and "may;" and

Whereas, determination of questions raised in this dispute regarding absentee ballot procedures involve important and unresolved questions of law; and

Whereas, these questions must be resolved before the House can determine the results of this election pursuant to the Maine Constitution, Article IV, Part Third, Section 3; and

Whereas, it appears to the members of the House of Representatives of the 108th Legislature that questions of law have arisen which make this occasion a solemn one; now, therefore, be it

ORDERED, that in accordance with the provisions of the Constitution of the State, the Justices of the Supreme Judicial Court are hereby respectfully requested to give their opinion on the following questions:

1. Do the provisions of Title 21, section 1577, prevent inspection of absentee ballot applications and absentee ballot envelopes, prior to the separation of the ballots from the envelopes and the placement of absentee ballots in the ballot box, for the purpose of challenging specific absentee ballots, based on irregularities in execution of the application or envelopes?

2. May the clerk issue an absentee ballot to an applicant who has not been certified by the registrar to be a registered voter?

3. Must challenges to absentee ballots, based on irregularities in execution of absentee ballot envelopes, be made in accordance with the provisions of Title 21, section 1257, prior to deposit of the absentee ballots in the ballot box?

4. If the answer to question 3 is in the negative, please answer the following question: Can a candidate first raise an objection to absentee ballots, based on alleged irregularities in execution of absentee ballot applications or absentee ballot envelopes, at the time of a recount?

5. Where the facts indicate that in the execution of certain absentee ballot applications and absentee ballot envelopes, the provisions of Title 21, section 1253, subsections 2, 4 or 5; section 1254, subsections 4 or 5; or section 1261 were not complied with in the manner alleged in the facts stated by the Commission on Governmental Ethics and Election Practices, is it proper to not count all absentee ballots in determining an election?

### APPENDIX A COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES

In Re: Appeal of Jed Davis
    General Election, House District # 45

The Commission met on December 10, 1976, to hear the appeal of Jed Davis brought before the Commission pursuant to the provisions of 21 M.R.S.A. Section 1422. Mr. Davis appeared represented by James E. Mitchell, Esq. Mr. Davis also spoke for himself. One of Mr. Davis's opponents, and the prevailing party in the election, Mr. David Ault, appeared represented by Charles Moreshead, Esq., and Gordon Smith, Esq. A third candidate in the election, Mr. Charles Rollins, did not appear.

Mr. Davis and Mr. Ault were the Democratic and Republican candidates, respectively, for election to the House of Representatives from District 45. All 263 absentee ballots were subject to challenge, and in

addition, 40 ballots, including four absentee ballots, were disputed because of markings, or alleged improper markings, on the face of the ballot or in the manner of marking the ballot.

The grounds for dispute of the absentee ballots as specified in papers filed on behalf of Jed Davis were as follows:

A. 53 absentee ballots were challenged on the grounds that the name and address of the voter were not written or typed in the upper left-hand corner of the return envelope by the town clerk.

B. Three were challenged because the envelope was not signed by the voter.

C. Four were challenged because the voter's signature on the envelope was not certified.

D. Nine were challenged because no reason for voting absentee were specified on the envelope.

E. One was challenged because no address appeared on the envelope.

F. Two were challenged because the absentee ballot applications were not signed by the voter.

G. Seventeen were challenged because the registrar of voters did not certify the applicant to be a registered voter.

H. Seventy-eight were challenged because the voters did not designate a recipient for the absentee ballot on the application.

No question of fraud was pressed regarding the absentee ballots, although investigation was urged in some documents submitted on behalf of Mr. Davis. It could not be determined exactly how many absentee ballots might be defective, since more than one alleged defect might have applied to the same ballot. Further, it was conceded that none of the absentee ballots were challenged at the polling place at the time the absentee ballot envelopes were opened and deposited in the ballot box, nor was a challenge made at any other time when it would have been possible to tie specific ballots to the envelopes and applications containing the alleged defects. According-

ly, Mr. Davis contested the validity of all absentee ballots. The challenge regarding the absentee ballots was thus raised for the first time at the recount and reiterated in the appeal hearing before the Commission. To preserve rights to challenge inadequacies in the qualifications of absentee voters, as in the qualifications of regular voters, such challenges must be lodged at the polling place as provided in 21 M.R.S.A. Section 1257, which references back to and specifies the challenge method under 21 M.R.S.A. Section 863. Part of the qualification of the absentee voter is the adequacy of the documents, the absentee voter application and the envelope, by which that voter qualifies to vote absentee.

Because of the failure to properly raise the challenge at the polling place, as required by law, the Commission is of the view that the challenger has waived his rights to challenge the absentee ballots based on defects in the envelopes and the applications, and that therefore the matter cannot be properly considered by the Commission for it is raised, in the first instance, on appeal. Thus, the Commission took no evidence on the absentee ballot point.

Were the law the other way, election contestants might be encouraged not to raise challenges to absentee ballots at the polling place and wait and see the results of the election. If the results of the election were unfavorable to a particular contestant, the contestant could then, with the absentee ballots and envelopes separated, challenge not only the defective absentee ballots but all absentee ballots, as occurred in this case. Were those challenges successful, the voters who submitted inadequate absentee ballot documents would be deprived of the franchise and, in addition, all of those voters who submitted adequate absentee ballot documents would be deprived of the franchise. Thus, for example, defects in the absentee ballot materials for just a few people would, if the doctrine advocated by Mr. Davis applies, deprive hundreds, or perhaps thousands, of people of their franchise. In such circumstances there might be strong encouragement to wait, and perhaps

even submit a few improperly executed absentee ballot documents, and then argue on the basis of those documents for voiding all absentee ballots or for calling a new election. The potential for such abuse, however, can be easily avoided simply by adherence to the requirement of law that challenges to absentee ballot documents, to be pressed as valid challenges, must be lodged at the polling place at the time the vote is cast as required by law.

This doctrine is particularly important where, as in this case, the alleged defect affects some but not all of the absentee ballots. Accordingly, the Commission denies the request to consider the validity of 263 absentee ballots. The grounds for denial are that the matter was not properly raised at the polling place and thus cannot be considered on this appeal.

Subsequent to argument of counsel regarding the absentee ballot matter and consideration of briefs submitted on this point, the parties proceeded to examination of the 40 ballots which were disputed on the grounds of defects alleged on the face of the ballot or in the manner of casting the ballot. At the conclusion of this examination, counsel for both parties stipulated that the result of the election, based on the review by the Commission, would be 1811 votes for Mr. Ault and 1781 votes for Mr. Davis. With this stipulation, counsel indicated that findings of fact and conclusions of law relating to the 40 disputed ballots were not necessary.

If the House of Representatives adopts the Commission's findings, the Commission recommends that the House request that the Secretary of State submit a corrected vote tabulation to the Governor.

Dated: January 4, 1977

> COMMISSION ON GOVERN-
> MENTAL ETHICS AND ELEC-
> TION PRACTICES
> Commissioner Barnett I. Shur did not participate in consideration of this matter.
> By: <u>Madeleine R. Freeman</u>
> CHAIRMAN

## ANSWERS OF THE JUSTICES

To the Honorable House of Representatives of the State of Maine:

In compliance with the provisions of Section 3 of Article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit our answers to the questions propounded on March 2, 1977.

A preliminary statement will clarify the pattern of our approach to the questions.

▇▇▇ We are constitutionally authorized to give an advisory opinion only as to matters concerning which there is a "solemn occasion." *Opinion of the Justices,* Me., 355 A.2d 341, 388 (1976). There is no such solemn occasion where our advice would relate to matters merely "tentative, hypothetical and abstract." *Opinion of the Justices,* Me., 330 A.2d 912, 915 (1975).

▇▇▇ As will be seen from our subsequent discussion, we answer Question No. 3 in the affirmative and Question No. 1 in the negative. Since these answers establish that the law precludes further consideration of the matters purported to be raised by the challenges to the absentee ballot envelopes and applications here involved, the issues raised in Questions No. 2 and No. 5 thereby become "tentative, hypothetical and abstract." To answer them would call upon us to interpret existing statutes in circumstances in which such interpretation is not required by the facts placed before us by the House of Representatives. This we cannot do. See: *Opinion of the Justices,* Me., 339 A.2d 483, 488 (1975). We must therefore respectfully decline to answer Questions No. 2 and No. 5.

We first consider Question No. 3, since the background of its resolution will assist in our answer to Question No. 1.

QUESTION No. 3: Must challenges to absentee ballots, based on irregularities in execution of absentee ballot envelopes, be made in accordance with the provisions of Title 21, section 1257, prior to deposit of the absentee ballots in the ballot box?

ANSWER: We answer in the affirmative.

■ The Commission on Governmental Ethics and Election Procedures concluded that, under 21 M.R.S.A. §§ 1257 and 863, challenges concerning absentee ballots must be made before the ballots are cast. In its opinion, set forth as Appendix A to the questions propounded, the Commission reasoned that its reading of §§ 1257 and 863 best effectuated the goals of promoting the count of votes properly cast by qualified voters and preventing abuse of the electoral process.

The Commission correctly interpreted §§ 1257 and 863.

Section 1257 provides:

"An absentee ballot may be challenged the same as a regular ballot as provided in section 863."

Section 863 permits any voter of the municipality to challenge the right of another to vote and sets forth the requisite procedure. The challenging party must make known his challenge to the warden. Thereupon, the election clerk writes "Challenged" beside the voter's name on the voting list. More important, the warden must take a blank ballot, mark it "Challenged", and write thereon the name of the challenger, the name of the voter challenged, and the reason for challenge. Thus, before the challenged voter casts his ballot it has been identified to be his. Should the challenge prove justified, the invalid ballot can be rejected because identified.

The absentee voter, by definition, cannot be challenged in this precise manner. He does not appear and ask for a ballot, so that the ballot can be marked before he votes if challenged. Instead, he "appears" at the time of counting, when the warden or clerk turns to the envelopes containing the absentee ballots. 21 M.R.S.A. §§ 1259, 1259–A. Because each return envelope, and each application where one is required, must con-

tain the voter's name, 21 M.R.S.A. § 1253, his identity is apparent. If challenged at that point, the election officials can proceed to mark the ballot as provided in § 863.[1] Once, however, the official has opened all approved envelopes and inserted the absentee ballots into the ballot box, the connection between the voter and his ballot is gone.

■ We therefore conclude that the right to challenge is lost once the envelopes and applications are separated from the ballots. Any challenge after this time must, as is generally true in the case of a regular voter, be limited to facial defects in the ballots, or irregularities common to whole classes of identifiable ballots. See, e. g., *Opinion of the Justices,* 124 Me. 453, 474, 475, 126 A. 354 (1924).

We believe this interpretation of § 863 is in accord with other relevant statutory provisions.

■ We do not read the word "may" in § 1257 as a legislative indication that other, later methods of challenge exist. Instead, we interpret "may" in § 1257, and in § 863 itself, as authorizing a right of challenge. *Boynton v. Adams,* Me., 331 A.2d 370, 372, 373 (1975); *Dumont v. Speers,* Me., 245 A.2d 151, 153, 154 (1968).

We also note that the procedure for challenge at a municipal caucus parallels that here for what we perceive to be similar reasons. 21 M.R.S.A. § 364. Under § 364 challenge at a municipal caucus must precede the voice or written vote contemplated by 21 M.R.S.A. § 363. When it occurs, the challenged voter must swear that certain information is true upon pain of prosecution if his statements prove false. While these provisions do not necessarily achieve continuing identification of the challenged vote as do the provisions of § 863—since there is no requirement that a written ballot be marked—they do illustrate a parallel legislative

---

1. A challenge to the eligibility of an absentee voter may be based on grounds other than those pertinent to all voters. In addition to questions of residence, registration, and the like, a challenger may raise, in special regard to the absentee voter, whether his reason for voting absentee meets statutory requirements, and whether he has complied with material criteria concerning the ballot envelope and, where necessary, the application form.

concern that challenge occur at a meaningful point in the process. Presumably, the unqualified voter will decline to vote when confronted with the requisite oath.

■■ The key, then, as reflected in the statutory scheme and supported by common sense, is that challenges are waived where failure adequately to preserve them precludes the fashioning of an appropriate remedy. When a challenged ballot is identified pursuant to § 863, the remedy is precisely tailored to the wrong. Should the challenge prove justified, the unqualified voter's ballot will not be counted. When, however, a challenger has waited until the challenged ballot can no longer be distinguished from the others, he seeks disenfranchisement of many for the error of one. Thus, as in the case of parties seeking appellate correction of alleged trial error, the challenger must mount his challenge at a time when it can be dealt with fairly to all. See: *Miller v. Hutchinson,* 150 Me. 279, 110 A.2d 577 (1954). See also: *Opinion of the Justices,* 152 Me. 219, 226, 130 A.2d 526 (1956).

Cases in other jurisdictions which have addressed the issue in comparable contexts agree with this view. See: *Bell v. Gannaway,* 303 Minn. 346, 227 N.W.2d 797 (1975); *Application of O'Shaughnessy,* 15 A.D.2d 183, 223 N.Y.S.2d 408 (1961); *Folse v. La-Fourche Democratic Committee,* La.App., 160 So.2d 363, 364, 365 (1964); *State ex rel. Nichols v. Schmoutey,* Mo.App., 418 S.W.2d 385, 386 (1967).

QUESTION No. 1: Do the provisions of Title 21, section 1577, prevent inspection of absentee ballot applications and absentee ballot envelopes, prior to the separation of the ballots from the envelopes and the placement of absentee ballots in the ballot box, for the purpose of challenging specific absentee ballots, based on irregularities in execution of the application or envelopes?

ANSWER: We answer in the negative.

■ The discussion in our answer to Question No. 3 has clarified that limiting the right to challenge absentee ballots to the period prior to deposit in the ballot box

means the challenger will want to inspect the envelopes and applications at that time. Were we to read 21 M.R.S.A. § 1577 as preventing such inspection, we should question seriously our above conclusions as to the limited time for challenge. We find, however, that § 1577 contemplates inspection of the envelopes and application forms before separation and deposit in the ballot box of the relevant ballots.

Section 1577 provides:

"All lists, books, documents and records required to be prepared by or filed with a public official are public records.

"*1. Exceptions.* Ballots, *absentee ballot application and absentee ballot envelopes* are not public records and *may be inspected only in accordance with this Title.*" (emphasis supplied)

Since absentee ballot applications and envelopes are excepted from election documents classified as "public records", they are therefore not "open to public inspection during usual business hours" under 21 M.R.S.A. § 1–29. Section 1577, however, does intimate that election documents not defined as "public records" are subject to some right of inspection "in accordance with this Title." 21 M.R.S.A. § 1577–1.

This reference in § 1577–1 leads us to the provisions of § 924 (counting procedure in general) and § 1259 (counting procedure concerning absentee ballots in particular).

Section 924 directs election officials to count the ballots as soon as the polls are closed. For present purposes the key provision of that statute is subsection 1:

"The ballots must be counted publicly so that those present may observe the proceedings."

The stated purpose of subsection 1 is clear: —the counting must be done in such a way as to facilitate public observation. We infer from this stated purpose the ultimate but unarticulated goal:—the public observation must be such as to ensure to those present that the ballots are being counted correctly. Necessarily, then, a person present during the counting process may

inspect the ballots and the checklist at that time for this limited purpose.[2]

Absentee ballots are to be counted "the same as regular ballots." 21 M.R.S.A. § 1259–6. Thus, the condition of public observation imposed in general by § 924–1 applies with equal force to absentee ballots.

■ Here in question, however, is the right to inspect not the absentee ballots but the absentee ballot applications and envelopes. Further, the time for inspection here at issue occurs before the ballots are counted pursuant to § 924 as incorporated by reference into § 1259–6. The ultimate inquiry, then, is whether public observation is contemplated when the absentee ballot applications and envelopes are inspected by election officials prior to their separation from the ballots. We conclude that it is.

First, the procedures to be followed by the warden specified in § 1259–1, § 1259–2, and § 1259–3 themselves contain some indication of the open nature of the process. The warden is to review all pertinent documents and reject ballots where appropriate. Once he determines which ballots may be counted,

> "[h]e shall then *announce* the name of each absentee voter . . . and remove each ballot from its envelope . . . . After having an election clerk, . . . mark the letters 'AV' beside the name of each absentee voter on the incoming voting list, he shall deposit the ballot in the ballot box." (emphasis supplied)

The direction that the warden "announce" each name is most significant since implicit in the requirement of an announcement is the thought that someone be present for whose benefit the announcement is made. We conclude that the warden's announcement is for the benefit of those present to observe the counting process under § 924–1. The warden's public identification of each

absentee voter at this time—while the ballot still remains in the relevant envelope—enables a person present and wishing to challenge the absentee voter as ineligible to do so before the ballot is inserted in the ballot box and its connection to a particular voter lost.[3]

■ Second, we look upon § 924–1 itself, read in conjunction with § 1259, as directing public inspection of the entire counting process, including the steps taken in regard to absentee ballots before their separation from the ballot applications and envelopes. Under § 924–1, the right of observation attaches vis-a-vis counting in general. Section 1259 also speaks of the "counting procedure." That section, however, views "counting procedure" as encompassing more than the ultimate tabulation of votes ballot by ballot. It refers to the "*following* counting procedure" (emphasis supplied), and what follows includes all the steps concerning absentee ballots preliminary to their insertion in the ballot box for actual tabulation.

Third, our reading of "count" in §§ 924 and 1259 to comprehend all post-election steps preliminary to and including actual tabulation accords with the practical realities of those procedures as reflected elsewhere in §§ 924 and 1259.

Under § 924, the election officials are to count the ballots "as soon as the polls are closed." Section 1259, in turn, provides that the warden commence his review of absentee ballot applications and envelopes "[a]s soon as the polls are closed, and the regular ballots removed from the ballot box." Thus, the process in question is a continuous one. The warden reviews the absentee ballot forms, rejecting where necessary, while other officials tabulate the regular ballots. Eventually the warden announces each absentee voter and deposits

---

**2.** A candidate may, of course, inspect the ballots and checklist at a later time in connection with a contemplated recount. 21 M.R.S.A. § 1151.

**3.** The provision is obviously intended to serve the same function in the case of absentee vot-

ers as 21 M.R.S.A. § 861–1 does regarding regular voters. Section 861–1 reads:

> "A voter who wishes to vote must state his name, and street address in the municipality which has voting districts, to an incoming election clerk *who shall announce the name in a loud, clear voice.*" (emphasis supplied)

absentee ballots in the box for removal and tabulation once all have been processed. We find no indication that public observation applies only to part of this ongoing process. Indeed, it is difficult to perceive how such limitations would be accomplished.

QUESTION No. 4: If the answer to question 3 is in the negative, please answer the following question: Can a candidate first raise an objection to absentee ballots, based on alleged irregularities in execution of absentee ballot applications or absentee ballot envelopes, at the time of a recount?

ANSWER: Since we have answered Question No. 3 in the affirmative, Question No. 4 by its terms requires no answer.

Dated at Portland, Maine, this tenth day of March, 1977.

> ARMAND A. DUFRESNE, Jr.
> CHARLES A. POMEROY
> SIDNEY W. WERNICK
> JAMES P. ARCHIBALD
> THOMAS E. DELAHANTY
> EDWARD S. GODFREY